Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

RICHARD MOORE, derivatively on behalf of
VERB TECHNOLOGY COMPANY, INC.,

     Plaintiff,

     vs.

RORY J. CUTAIA, JEFF CLAYBORNE, and
JAMES P. GEISKOPF,

     Defendants,

     and

VERB TECHNOLOGY COMPANY, INC.,

     Nominal Defendant.

Case No.:

<u>JURY TRIAL DEMANDED</u>

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## <u>INTRODUCTION</u>

Plaintiff Richard Moore ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Verb Technology Company, Inc. ("Verb" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Rory J. Cutaia, Jeff Clayborne, and James P. Geiskopf (collectively, the "Individual Defendants" and together with Verb, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Verb, unjust enrichment, and waste of corporate assets. As for his complaint against the Individual Defendants, Plaintiff alleges the following

based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Verb, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Verb's directors and officers from January 3, 2018 through the present (the "Relevant Period").

2.     Verb is a Nevada corporation with its principal executive offices located in Los Angeles, California. Verb provides cloud-based software products focused on "Customer Relationship Management" ("CRM"). The CRM industry is intensely competitive, and Verb has failed to generate any significant profits since the Company was founded.

3.     On January 2, 2018, shortly before the start of the Relevant Period, Verb entered into an agreement (the "Oracle Agreement") with Oracle Corporation ("Oracle"), one of the largest software companies in the world, and a well-established player in the CRM industry.

4.     The Oracle Agreement provided that Verb would develop an application to integrate "notifiCRM," the Company's principal CRM application, into "NetSuite," Oracle's CRM services platform. The Oracle Agreement further provided that Oracle would reserve the right to use or decline to use Verb's trade name, trademarks, or other marketing materials in conjunction with any of Oracle's marketing activities.

5.      During this time, the Individual Defendants conspired to grossly misrepresent the terms of the Oracle Agreement to the public in order to create a more favorable perception of the Company's business prospects and artificially inflate the value of the Company's stock.

6.      On January 3, 2018, Verb announced the Oracle Agreement in a current report filed with the SEC on a Form 8-K (the "January 8-K"). The January 8-K claimed that Oracle and the Company had agreed to jointly develop an application to integrate notifiCRM into NetSuite, which Oracle would then market through its "existing network of approximately 2,000 Oracle NetSuite sales reps."

7.      Verb continued to tout the Oracle Agreement during the next several months. On February 23, 2018, during an interview with Uptick Newswire, Defendant Cutaia stated that Oracle would sell notifiCRM as an "upgrade" to NetSuite. Defendant Cutaia made similar representations in a March 1, 2018 video posted to YouTube, which stated that Oracle "will market [the Company's] product as an upgrade feature" to Oracle customers.

8.      On April 2, 2018, the Company filed with the SEC its annual report for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K stated that the Company and Oracle had entered into an agreement to "integrate [the Company's] notifiCRM product into [Oracle's] NetSuite platform on a revenue share basis."

9.      During the time the Company issued these false and misleading statements, the price of the Company's stock rose dramatically. At the close of trading on April 19, 2018, the price of the Company's stock was $2.70 per share, an astonishing increase of over 2000% from the $0.12 per share price of the Company's stock at the close of trading on January 3, 2018.[1]

10.     On April 23, 2018, the Company issued a report that disclosed, for the first time, the text of the Oracle Agreement. This disclosure made it clear to the investing public that the Company's

---

[1] The stock prices listed herein are adjusted for the Company's 15:1 reverse stock split effective at the close of business on February 4, 2019.

relationship with Oracle was not what the Company had purported it to be. Nevertheless, the report maintained to investors that a press release announcing the integration of Verb's product with NetSuite had been prepared and was underway for public release.

11. Over the course of the next few days, the price of the Company's stock declined precipitously. By the close of trading on April 27, 2018, the price of the Company's stock was $1.28, a decrease of nearly 48% from the Company's stock price at the close of trading on April 19, 2018, prior to the Company's disclosure.

12. On April 30, 2018, in an attempt to assuage the market's concerns, Defendant Cutaia released a video claiming that the Company and Oracle would release a joint press release "within days" to shed more light on the Oracle Agreement and the nature of the relationship between Oracle and the Company. No such press release was ever issued.

13. Following this announcement, as the market questioned the true relationship between Verb and Oracle, the price of Verb stock continued to plummet, from $1.54 per share at the close of trading on April 30, 2018, to $1.08 at the close of trading on May 2, 2018, representing a 60% decline from the Company's stock price at the close of trading on April 19, 2018.

14. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Verb, willfully or recklessly made and/or caused the Company to make false and misleading statements regarding the Company's operations and business prospects. Specifically, the Individual Defendants willfully or recklessly misrepresented and/or caused the Company to misrepresent the nature of its relationship with Oracle by making false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Oracle had not agreed to jointly develop an application to integrate notifiCRM into NetSuite; (2) Oracle had not agreed to jointly market the Company's software to its customers and the public through, *inter alia*, Oracle's existing network of sales representatives; (3) the Oracle Agreement had thus been overstated; (4) the Oracle Agreement merely provided Verb with access

to an application developer toolkit and; (5) Verb had to pay a fee to Oracle in connection with the partnership and access to the toolkit. As a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

15.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

16.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain internal controls.

17.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company and its Chief Executive Officer ("CEO") and President to two federal securities fraud class action lawsuits pending in the United States District Court for the Central District of California (the "Securities Class Actions"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who benefitted from the wrongdoing alleged herein, the Company has and will have to expend many millions of dollars.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested and/or independent directors, a majority of Verb's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

20.     Additionally, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Securities Exchange Act of 1934 (the "Exchange Act").

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of California or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

24.     Venue is proper in this District because Verb's headquarters are located in this District. In addition, the Individual Defendants reside in this District, have conducted business in this District, and/or Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

25.     Plaintiff is a current shareholder of Verb. Plaintiff has continuously held Verb common stock since he purchased them during the beginning of the Relevant Period. Plaintiff is a citizen of Colorado.

**Nominal Defendant Verb**

26.     Verb is a Nevada corporation with its principal executive offices located at 344 South Hauser Boulevard, Suite 414, Los Angeles, California 90036.

27.     The Company's stock trades on the NASDAQ Stock Exchange ("NASDAQ") under the ticker symbol "VERB." The Company previously traded its stock on the OTC and OTCQB markets (together, the "OTC") under the ticker symbols "FUSZ" and "VRRB."

**Defendant Cutaia**

28.     Defendant Rory J. Cutaia ("Cutaia") has served as the Company's CEO, President, Chairman of the Board, Secretary, and Treasurer since he founded the Company in October 2014. According to the Company's annual report filed with the SEC on February 7, 2019 on a Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"), as of February 1, 2019, Defendant Cutaia beneficially owned 3,837,203 shares of the Company's common stock, which represented 30.1% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on February 1, 2019 was $0.51, Defendant Cutaia owned approximately $1.95 million worth of Verb stock.

29.     For the fiscal year ended December 31, 2018, Defendant Cutaia received $1,622,000 in compensation from the Company. This included $436,000 in salary and $1,186,000 in all other compensation.

30.     The 2018 10-K stated the following about Defendant Cutaia:

Rory J. Cutaia has been our Chairman of the Board, Chief Executive Officer, President, Secretary, and Treasurer since the formation of CMG, in which roles he has continued to serve through our October 2014 acquisition of bBooth USA to current. Mr. Cutaia founded CMG in 2012 and bBooth, Inc. in 2014. In May 2014, CMG and bBooth, Inc. merged and became known as bBoothUSA, which entity was acquired in October 2014 by GSD, our predecessor. Prior to that, from October 2006 to August 2011, he was a partner and *Entrepreneur-in-Residence* at Corinthian Capital Group, Inc. ("Corinthian"), a private equity fund based in New York City that invested in middle-market, U.S. based companies.

During his tenure at Corinthian, from June 2008 to October 2011, he was the co-founder and Executive Chairman of Allied Fiber, Inc., a company engaged in the construction of a nation-wide fiber-optic network, and from June 2007 to August 2011, Mr. Cutaia was the Chief Executive Officer of GreenFields Coal Company, a company engaged in the deployment of technology to recycle coal waste and clean-up coal waste sites. Before joining Corinthian, from January 2000 to October 2006, he founded and was the Chairman and Chief Executive Officer of The Telx Group, Inc. ("Telx"), a company engaged in the telecom carrier inter-connection, co-location, and data center business, which he sold in 2006. Before founding Telx, he was a practicing lawyer with Shea & Gould, a prominent New York City law firm. Mr. Cutaia obtained his Juris Doctorate degree from the Fordham University School of Law in 1985 and his Bachelor of Science, *magna cum laude*, in business management from the New York Institute of Technology in 1982. We believe that Mr. Cutaia is qualified to serve on our board of directors because of his knowledge of our current operations, in addition to his education and business experiences described above.

31.     Upon information and belief, Defendant Cutaia is a citizen of California.

**Defendant Clayborne**

32.     Defendant Jeffrey R. Clayborne ("Clayborne") has served as the Company's Chief Financial Officer ("CFO") since July 2016. According to the 2018 10-K, as of February 1, 2019, Defendant Clayborne beneficially owned 226,209 shares of the Company's common stock, which represented 1.8% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on February 1, 2019 was $0.51, Defendant Clayborne owned approximately $115,366 worth of Verb stock.

33.     For the fiscal year ended December 31, 2018, Defendant Clayborne received $127,000 in compensation from the Company. This included $110,000 in salary and $17,000 in option awards.

34.     The 2018 10-K stated the following about Defendant Clayborne:

Jeffrey R. Clayborne has been our Chief Financial Officer since July 15, 2016. Mr. Clayborne is an experienced finance professional with an entrepreneurial spirit and proven record of driving growth and profit for both Fortune 50 companies, as well as start-up companies. Prior to joining the Company, Mr. Clayborne served as Chief Financial Officer and a consultant with Breath Life Healing Center from August 2015 to July 2016. From September 2014 to August 2015, he served as Vice President of Business Development of Incroud, Inc and from May 2012 to September 2014, Mr. Clayborne served as President of Blast Music, LLC. Prior to this, Mr. Clayborne was employed by Universal Music Group where he served as Vice President, Head of Finance & Business Development for Fontana, where he managed the financial planning and analysis of the sales and marketing division and led the business development department. He also served in senior finance positions at

The Walt Disney Company, including Senior Finance Manager at Walt Disney International, where he oversaw financial planning and analysis for the organization in 37 countries. Mr. Clayborne began his career as a CPA at McGladrey & Pullen LLP (now, RSM US LLP), then at KPMG Peat Marwick (now, KPMG). He brings with him more than 20 years of experience in all aspects of strategy, finance, business development, negotiation, and accounting. Mr. Clayborne earned his Master of Business Administration degree from the University of Southern California, with high honors.

35.     Upon information and belief, Defendant Clayborne is a citizen of California.

**Defendant Geiskopf**

36.     Defendant James P. Geiskopf ("Geiskopf") served as a Company director since the formation of the Company in October 2014. Defendant Geiskopf also serves as a member of the Company's Audit Committee, Governance and Nominating Committee, and as the Chair of the Compensation Committee. Additionally, Defendant Geiskopf served as the Chair of the Audit Committee until September 10, 2018. According to the 2018 10-K, as of February 1, 2019, Defendant Geiskopf beneficially owned 367,600 shares of the Company's common stock, which represented 3% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on February 1, 2019 was $0.51, Defendant Geiskopf owned approximately $187,476 worth of Verb stock.

37.     The 2018 10-K stated the following about Defendant Geiskopf:

James P. Geiskopf has been one of our directors since the formation of bBooth USA, in which role he has continued to serve through our October 2014 acquisition of bBooth USA by GSD, our predecessor, to current. He also serves as our Lead Director. Mr. Geiskopf has 32 years of experience leading companies in the services industry. From 1975 to 1986, Mr. Geiskopf served as the Chief Financial Officer of Budget Rent a Car of Fairfield California and from 1986 to 2007, he served as its President and Chief Executive Officer. In 2007, he sold the franchise. Mr. Geiskopf served on the Board of Directors of Suisun Valley Bank from 1986 to 1993 and also served on the Board of Directors of Napa Valley Bancorp from 1991 to 1993, which was sold to a larger institution in 1993. Since 2014, Mr. Geiskopf has served on the board of directors of ICOX Innovations, Inc., a public company quoted on the OTC Markets Group Inc.'s OTCPK tier. From June 2013 to March 16, 2017, the date of his resignation, Mr. Geiskopf had served as a director of Electronic Cigarettes International Group, Ltd., a Nevada corporation, whose common stock had been quoted on the over-the-counter market ("ECIG"). ECIG filed a voluntary petition for relief under the provisions of Chapter 7 of Title 11 of the United States Code on March 16, 2017.

38.     Upon information and belief, Defendant Geiskopf is a citizen of California.

**<u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>**

39.     By reason of their positions as officers, directors, and/or fiduciaries of Verb and because of their ability to control the business and corporate affairs of Verb, the Individual Defendants owed Verb and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Verb in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Verb and its shareholders so as to benefit all shareholders equally.

40.     Each director and officer of the Company owes to Verb and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

41.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Verb, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

42.     To discharge their duties, the officers and directors of Verb were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

43.     Each Individual Defendant, by virtue of his, her, or its position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Verb, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed

a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Board at all relevant times.

44.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the OTC, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Additionally, the Individual Defendants had a duty not to cause the Company to waste corporate assets.

45.     To discharge their duties, the officers and directors of Verb were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Verb were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, California, and the United States, and pursuant to Verb's own Code of Ethics and Business Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Verb conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Verb and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Verb's operations would comply with all applicable laws and Verb's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

46.     Each of the Individual Defendants further owed to Verb and its shareholders the duty of loyalty requiring that each favor Verb's interests and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

47.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Verb and were at all times acting within the course and scope of such agency.

48.     Because of their advisory, executive, managerial, and directorial positions with Verb, each of the Individual Defendants had access to adverse, non-public information about the Company.

49.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Verb.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, and future business prospects; and (iii) artificially inflate the Company's stock price.

52.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the

Individual Defendants who is a director of Verb was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

53.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

54.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Verb and was at all times acting within the course and scope of such agency.

## VERB'S CODE OF ETHICS

55.     The Company's Code of Ethics and Business Conduct (the "Code of Ethics") provides that it was adopted by the Company to promote the following:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest;
- full, fair, accurate, timely and understandable disclosure in all reports and documents that the Corporation files with, or submits to, the Securities and Exchange Commission ("SEC") and in other public communications made by the Corporation;
- compliance with applicable governmental laws, rules and regulations;
- the protection of Corporation assets, including corporate opportunities and confidential information;
- fair dealing practices;
- the prompt internal reporting of violations of the Code; and
- accountability for adherence to the Code.

56.     The Code of Ethics states that it applies to "the Chief Executive Officer, President, Chief Financial Officer, Principal Executive Officer, Principal Financial Officer, Principal Accounting Officer, Controller, any Presidents of business units/divisions, any Vice-Presidents, any Executive Vice-

Presidents, and persons performing similar functions . . . along with all directors and employees within the Corporation and its subsidiaries. . ."

57.     In a section titled, "honest and ethical conduct," the Code of Ethics provides that "the [Company's] policy is to promote high standards of integrity by conducting its affairs honestly and ethically," stating:

The Corporation's policy is to promote high standards of integrity by conducting its affairs honestly and ethically.

Each Employee must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Corporation's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job.

A conflict of interest occurs when an individual's private interest (or the interest of a member of his or her family) interferes, or even appears to interfere, with the interests of the Corporation as a whole. A conflict of interest can arise when an Employee (or a member of his or her family) takes actions or has interests that may make it difficult to perform his or her work for the Corporation objectively and effectively. Conflicts of interest also arise when an Employee (or a member of his or her family) receives improper personal benefits as a result of his or her position in the Corporation.

Loans by the Corporation to, or guarantees by the Corporation of obligations of, Employees or their family members are of special concern and could constitute improper personal benefits to the recipients of such loans or guarantees, depending on the facts and circumstances. Loans by the Corporation to, or guarantees by the Corporation of obligations of, any Senior Officer or their family members are expressly prohibited.

Whether or not a conflict of interest exists or will exist can be unclear. Conflicts of interest should be avoided.

Specifically, each Employee must:

- act with integrity, including being honest and candid while still maintaining the confidentiality of information when required or consistent with the Corporation's policies;
- avoid violations of the Code, including actual or apparent conflicts of interest with the Corporation in personal and professional relationships;
- disclose to the Board or the Audit Committee any material transaction or relationship that could reasonably be expected to give rise to a breach of the Code, including actual or apparent conflicts of interest with the Corporation;
- obtain approval from the Board or Audit Committee before making any decisions or taking any action that could reasonably be expected to involve a conflict of interest or the appearance of a conflict of interest;

- observe both the form and spirit of laws and governmental rules and regulations, accounting standards and Corporation policies;
- maintain a high standard of accuracy and completeness in the Corporation's financial records;
- ensure full, fair, timely, accurate and understandable disclosure in the Corporation's periodic reports;
- report any violations of the Code to the Board or Audit Committee;
- proactively promote ethical behaviour among peers in his or her work environment; and
- maintain the skills appropriate and necessary for the performance of his or her duties.

58.     In a section titled, "Disclosure of Corporation Information," the Code of Ethics provides that the Company's SEC filings "must comply with all applicable securities laws and SEC rules and must be complete and correct in all material respects and understandable to the intended recipient," stating:

As a result of the Corporation's status as a public company, it is required to file periodic and other reports with the SEC.  The Corporation takes its public disclosure responsibility seriously to ensure that these reports furnish the marketplace with full, fair, accurate, timely and understandable disclosure regarding the financial and business condition of the Corporation.  All disclosures contained in reports and documents filed with or submitted to the SEC, or other government agencies, on behalf of the Corporation or contained in other public communications made by the Corporation must comply with all applicable securities laws and SEC rules and must be complete and correct in all material respects and understandable to the intended recipient.

The Senior Officers, in relation to his or her area of responsibility, must be committed to providing timely, consistent and accurate information, in compliance with all legal and regulatory requirements. It is imperative that this disclosure be accomplished consistently during both good times and bad and that all parties in the marketplace have equal or similar access to this information.

All of the Corporation's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Corporation's transactions, and must conform both to applicable legal requirements and to the Corporation's system of internal controls.  Unrecorded or "off the book" funds, assets or liabilities should not be maintained unless permitted by applicable law or regulation. Senior Officers involved in the preparation of the Corporation's financial statements must prepare those statements in accordance with generally accepted accounting principles, consistently applied, and any other applicable accounting standards and rules so that the financial statements materially, fairly and completely reflect the business transactions and financial statements and related condition of the Corporation.  Further, it is important that financial statements and related disclosures be free of material errors.  All Employees must cooperate fully with the Corporation's accounting and internal audit personnel as well as the Corporation's independent public accountants and legal counsel.

Specifically, each Senior Officer must:

- be familiar and comply with the disclosure requirements generally applicable to the Corporation and the Corporation's disclosure controls and procedures and its internal control over financial reporting;
- take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Corporation provide full, fair, accurate, timely and understandable disclosure;
- not knowingly misrepresent, or cause others to misrepresent, facts about the Corporation to others, including the Corporation's independent auditors, governmental regulators, self-regulating organizations and other governmental officials;
- to the extent that he or she participates in the creation of the Corporation's books and records, promote the accuracy, fairness and timeliness of those records; and
- in relation to his or her area of responsibility, properly review and critically analyse proposed disclosure for accuracy and completeness.

59.     In a section titled, "PROTECTION AND PROPER USE OF COMPANY ASSETS," the Code of Ethics provides that "[a]ll Employees should protect the [Company's] assets and ensure their efficient use," stating:

All Employees should protect the Corporation's assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on the Corporation's profitability and are prohibited.

All Corporation assets should be used only for legitimate business purposes. Any suspected incident of fraud or theft should be reported for investigation immediately. The obligation to protect Corporation assets includes the Corporation's proprietary information. Proprietary information includes intellectual property such as trade secrets, patents, trademarks, and copyrights, as well as business and marketing plans, engineering and manufacturing ideas, designs, databases, records and any non-public financial data or reports. Unauthorized use or distribution of this information is prohibited and could also be illegal and result in civil or criminal penalties.

All Employees owe a duty to the Corporation to advance its interests when the opportunity arises. Employees are prohibited from taking for themselves personally (or for the benefit of friends or family members) opportunities that are discovered through the use of Corporation assets, property, information or position.  Employees may not use Corporation assets, property, information or position for personal gain (including gain of friends or family members). In addition, no director, officer or employee may compete with the Corporation.

60.     In a section titled, "FAIR DEALING," the Code of Ethics states:

Each Employee must deal fairly with the Corporation's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job. No director, officer or employee may

take unfair advantage of anyone through manipulation, concealment, abuse or privileged information, misrepresentation of facts or any other unfair dealing practice.

61.     In a section titled, "Compliance with laws," the Code of Ethics provides that the Company and its officers and directors must comply with all applicable laws and regulations, stating:

The Employees must respect, obey and comply with all applicable foreign, federal, state and local laws, rules and regulations applicable to the business and operations of the Corporation.

Employees who have access to, or knowledge of, material nonpublic information from or about the Corporation are prohibited from buying, selling or otherwise trading in the Corporation's stock or other securities.  "Material nonpublic" information includes any information, positive or negative, that has not yet been made available or disclosed to the public and that might be of significance to an investor, as part of the total mix of information, in deciding whether to buy or sell stock or other securities.

Employees also are prohibited from giving "tips" on material nonpublic information, that is directly or indirectly disclosing such information to any other person, including family members, other relatives and friends, so that they may trade in the Corporation's stock or other securities.

Furthermore, if, during the course of an Employee's service with the Corporation, he or she acquires material nonpublic information about another company, such as one of the Corporation's customers or suppliers, or the Employee learns that the Corporation is planning a major transaction with another company (such as an acquisition), the Employee is restricted from trading in the securities of the other company.

62.     In a section titled, "Reporting actual and potential violations of the code and Accountability for compliance with the code," the Code of Ethics provides that the Company's officers and directors must report any violations of the Code of Ethics, and that failure to do so is itself a violation of the Code of Ethics, stating:

The Corporation, through the Board or the Audit Committee, is responsible for applying this Code to specific situations in which questions may arise and has the authority to interpret this Code in any particular situation.  This Code is not intended to provide a comprehensive guideline for Senior Officers in relation to their business activities with the Corporation.  Any Employee may seek clarification on the application of this Code from the Board or the Audit Committee.

Each Employee must:

• notify the Corporation of any existing or potential violation of this Code, and failure to do so is itself a breach of the Code; and

- not retaliate, directly or indirectly, or encourage others to do so, against any Employee for reports, made in good faith, of any misconduct or violations of the Code solely because that Employee raised a legitimate ethical issue.

The Board or the Audit Committee will take all action it considers appropriate to investigate any breach of the Code reported to it.  All Employees are required to cooperate fully with any such investigations and to provide truthful and accurate information.  If the Board or the Audit Committee determines that a breach has occurred, it will take or authorize disciplinary or preventative action as it deems appropriate, after consultation with the Corporation's counsel if warranted, up to and including termination of employment.  Where appropriate, the Corporation will not limit itself to disciplinary action but may pursue legal action against the offending Employee involved.  In some cases, the Corporation may have a legal or ethical obligation to call violations to the attention of appropriate enforcement authorities.

Compliance with the Code may be monitored by audits performed by the Board, Audit Committee, the Corporation's counsel and/or by the Corporation's outside auditors.  All Employees are required to cooperate fully with any such audits and to provide truthful and accurate information.

Any waiver of this Code for any Employee may be made only by the Board or the Audit Committee and will be promptly disclosed to stockholders and others, as required by applicable law.  The Corporation must disclose changes to and waivers of the Code in accordance with applicable law.

63.    The Individual Defendants violated the Code of Ethics by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

64.    Verb purports to be a provider of "cloud-based business software products." The Company's primary offering is a CRM software application that allows marketing and sales professionals to communicate with their customers via interactive video. During the Relevant Period, this CRM application was called notifiCRM.

65.     CRM products encompass a range of software applications and tools used to manage a company's interactions and relationships with current and potential customers.

66.     Verb has rebranded itself a number of times over the course of its life, having previously done business under the names Cutaia Media Group, LLC, Global System Designs, Inc., bBooth, Inc., bBooth (USA), Inc., and most recently, nFusz, Inc.

67.     Prior to April 5, 2019, Verb shares were traded on the OTC Marketplace under the ticker symbols "FUSZ" and "VRRB."

68.     Verb has not generated any significant profits and has consistently incurred heavy losses since the Company was founded. The 2018 10-K disclosed that the Company's net loss for the fiscal year ended December 31, 2017 was $7,266,00, and the Company's net loss for the fiscal year ended December 31, 2018 was a staggering $12,127,000.

69.     The 2018 10-K maintained that during the fiscal year ended December 31, 2018, the Company "lack[ed] sufficient internal controls over financial reporting," and that "implementing acceptable internal controls will be difficult." The 2018 10-K listed the following reasons for the Company's lack of sufficient internal controls:

- there is a lack of segregation of duties necessary for a good system of internal control due, to insufficient accounting staff due to our size;

- the staffing of our accounting department is weak due to the lack of qualifications and training, and the lack of formal review process;

- our control environment is weak due to the lack of an effective risk assessment process, the lack of internal audit function, and insufficient documentation and communication of the accounting policies; and

- failure in the operating effectiveness over controls related to recording revenue.

70.     The CRM industry in which Verb operates is highly competitive, and is dominated by a number of large, well established companies, including Oracle.

71.     Oracle is a multinational computer technology company that provides products and services that address all aspects of information technology environments. In 2018, Oracle was one of the largest software companies in the world, by revenue.

72.     One of Oracle's software offerings is NetSuite, a leading cloud-based software service that provides CRM resources, as well as revenue and supply chain management tools to medium and small businesses.

73.     On January 2, 2018, Verb and Oracle entered into the Oracle Agreement, which stipulated that Oracle would provide Verb with a software developer toolkit that would allow notifiCRM to interface with Oracle's NetSuite platform. The terms of the Oracle Agreement also stated that Oracle reserved the right to use Verb's marketing materials in connection with Oracle's marketing activities.

74.     On or around that date, the Individual Defendants concocted a scheme to greatly exaggerate the terms of the Oracle Agreement to the investing public, in order to artificially inflate the value of the Company's stock. The Individual Defendants aimed to implement this scheme by falsely claiming that Oracle had agreed to market the Company's software, including notifiCRM, to Oracle's customer base through its substantial salesforce, and to "jointly" develop an application with the Company to integrate notifiCRM into NetSuite.

**False and Misleading Statements**

***January 3, 2018 8-K***

75.     On January 3, 2018, Verb issued the January 8-K, announcing that the Company had entered into an agreement with Oracle to develop a software application for Oracle to market to its customers. The January 8-K stated, in relevant part:

**Item 1.01. Entry into a Material Definitive Agreement.**

On January 2, 2018 we entered into an agreement with ORACLE AMERICA, INC. ("ORACLE") (the "Agreement") pursuant to which we agreed to develop an application (a "Partner Application" as defined in the Agreement) to facilitate the integration of our notifiCRM interactive video messaging technology into the NetSuite Software-as-a-

Service (SaaS) platform developed by ORACLE (the "ORACLE SERVICE"), and to ensure the interoperability of our notifiCRM technology with the ORACLE SERVICE. The Parties intend that all ORACLE NetSuite customers (existing and future) that pay an additional per user fee (discussed below), will have the ability to create, edit, send, and track notifiCRM interactive video messaging seamlessly through the ORACLE NetSuite user interface. The ORACLE SERVICE integrates Enterprise Resource Planning, Customer Relationship Management, E-commerce (web site hosting, web store transactions) and partner collaboration capabilities.

***The Agreement provides that the development of the application, which will be undertaken jointly by us and ORACLE, will be completed within one year.*** We anticipate that development of the application, which has already begun, will be completed within 120 days. The Agreement is for an initial term of one year, but renews automatically for successive one-year terms, unless sooner terminated in accordance with the termination provisions set forth in the Agreement.

Upon completion of development and testing of the application, ***it will be marketed jointly by us and ORACLE, through, among other things, ORACLE'S existing network of approximately 2,000 ORACLE NetSuite sales reps***. Pricing is yet to be finalized, but it is estimated that the integrated notifiCRM feature set will be offered at a price of between $10 and $25 (or such higher price, depending upon the requested features and functionality) per user, per month, (the "notifiCRM Fee") which is in addition to the price each user pays for the ORACLE SERVICE. The Agreement provides that the notifiCRM fee will be shared between us and ORACLE as follows: 90% to us and 10% to ORACLE.

The Agreement contains covenants, representations and warranties of us and ORACLE that are typical for agreements of this type, including, among other things, provisions for confidentiality, intellectual property, and the licensed use of each other's trademarks for marketing purposes. The Agreement is non-exclusive. It is currently contemplated that once the application is available to be marketed to ORACLE customers, the Parties will prepare and distribute a joint press release.

The foregoing description of the terms of the Agreement, does not purport to be complete and is subject to and qualified in its entirety by reference to the Agreement itself, the terms of which are incorporated herein by reference. The benefits and representations and warranties set forth in such document (if any) are not intended to and do not constitute continuing representations and warranties of us or any other party to persons not a party thereto.

(Emphasis added).

### February 23, 2018 Uptick Newswire Interview

76.     On February 23, 2018, Uptick Newswire posted a video interview with Defendant Cutaia on YouTube. During the interview, Defendant Cutaia discussed the Oracle Agreement, stating that the Company and Oracle would issue a joint press release in "30 to 45 days," and that Oracle would sell

notifiCRM as an "upgrade" to Oracle's NetSuite user interface. Defendant Cutaia also maintained that Oracle's 2,000 employee salesforce would market Verb's technology.

### March 1, 2018 Video Presentation

77. On March 1, 2018, Defendant Cutaia posted a video on YouTube touting the Oracle Agreement. The video stated, in relevant part:

> The 300 billion dollar public company with who we just signed a contract to incorporate our interactive video technology into their CRM platform. They have got millions of current subscribers and a sales force of over 2,000 people who will market our product as an upgrade feature to all of those customers. And best of all, we keep 90% of the monthly recurring revenue from each one of those sales. Game changer for us and a huge advancement for them.

### April 2, 2018 Form 10-K

78. On April 2, 2018, the Company filed the 2017 10-K with the SEC. The 2017 10-K was signed by Defendants Cutaia, Clayborne, and Geiskopf, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Cutaia and Clayborne attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

79. With respect to the Oracle Agreement, the 2017 10-K stated:

> We enter into license or partnership agreements with other CRM providers to incorporate our notifiCRM technology into such other CRM providers' software platform that they offer to their existing and prospective client base, for an additional monthly fee which is shared with us. In January 2018, we entered into such an agreement with Oracle America, Inc. to integrate our notifiCRM product into their NetSuite platform on a revenue share basis.

80. The statements in ¶¶75–79 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) Oracle had not agreed to jointly develop an application to integrate notifiCRM into NetSuite; (2) Oracle had not agreed to jointly market the Company's software to its customers and the public through, *inter alia*, Oracle's existing network of sales representatives; (3) the Oracle Agreement

had thus been overstated; (4) the Oracle Agreement merely provided Verb with access to an application developer toolkit and; (5) Verb had to pay a fee to Oracle in connection with the partnership and access to the toolkit. As a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

81.     During the time the Company issued the false and misleading statements described herein, the price of the Company's stock rose by over 2000%, from $0.12 per share at the close of trading on January 3, 2018, to $2.70 per share at the close of trading on April 19, 2018.

### The Truth Begins to Emerge

82.     On April 23, 2018, the Company filed with the SEC a report on Form 8-K (the "April 8-K") disclosing, for the first time, the actual terms of the Oracle Agreement.

83.     The text of the Oracle Agreement, which was attached as an exhibit to the April 8-K, revealed that there was no agreement between Oracle and the Company for Oracle to market the Company's application to Oracle's customers, nor was there any agreement to jointly develop   an application to integrate notifiCRM into NetSuite. In relevant part, the Oracle Agreement stated:

4.     Partner Program Requirements.

4.8. Development. Partner will develop and make commercially available at least one (1) Partner Application or Partner Connector within one (1) year from the Effective Date.
* * *
4.10. Inspection. Only Partner Applications or Partner Connectors authorized by Oracle may be made available to Customers. Oracle's authorization of a Partner Application or Partner Connector does not mean that Oracle has inspected or reviewed the Partner Application or Partner Connector. Oracle may inspect the Partner Application or Partner Connector, including the source code and documentation related thereto, at any time during the Term. If, during such inspection, Oracle determines that the Partner Application or the Partner Connector is in violation of this Agreement, including any security requirements, any Partner Program rules, or the Marketing Guidelines, or is otherwise unsatisfactory, Oracle may terminate this Agreement, require that Partner modify the Partner Application or Partner Connector, or suspend Partner's access to the Service until the violation or other issues are resolved.

* * *

5.      Marketing.

5.1. Participation on SuiteApp.com. Within one (1) month from the commercial availability of Partner Application or Partner Connector or upon request from Oracle, Partner will provide marketing information about Partner, the Partner Application, or the Partner Connector ("Marketing Materials") to be posted on the SuiteApp.com area of the Oracle website, in the Partner Program newsletter, or in connection with any Oracle marketing activities. Partner grants to Oracle a non-exclusive, worldwide, fully-paid, royalty free license during the Term to use the Marketing Materials, including any of Partner's Marks, trade names, or other trademarks included therein, in connection with any Oracle marketing activities, and to list Partner as a Oracle partner wherever such lists may appear. Oracle reserves the right, in its sole discretion, to refuse to list the Partner Application or Partner Connector on SuiteApp.com or to remove or modify Marketing Material. For avoidance of doubt, only Partner Applications and Partner Connectors that have met the requirements of the Quality Program as set forth in Section 4.12 will be listed on SuiteApp.com.

* * *

5.4. Partner Activities. Unless otherwise expressly authorized in advance in writing by Oracle, Partner will not in any way express or imply that any opinions contained in Partner's promotional activities are endorsed by Oracle. Neither Partner, nor someone acting for Partner, will solicit any persons or entities which Partner knows to be (or should reasonably know to be) an Oracle Customer for any purpose, except for the purpose of promoting the applicable Partner Application, Partner Connector, or Oracle products and services.  Partner will not diminish or damage the reputation or goodwill of Oracle or the Service.

* * *

14. Publicity. Subject to the permission granted in Section 5 of this Agreement, neither Party will issue any press release, make a public statement, or publicize this Agreement, without the prior written consent of the other Party.  Notwithstanding the foregoing, each Party will be entitled to comply with government reporting obligations and information request in connection with this Agreement.

84.      Critically, the text of the Oracle Agreement revealed the full extent of the relationship between Oracle and the Company. Oracle had merely provided the Company with a developer toolkit, for a fee, so that the Company could modify its applications to make them compatible with Oracle's NetSuite interface.

85.      Nevertheless, the April 8-K downplayed the discrepancies between the Company's prior representations and the actual terms of the Oracle Agreement, stating, in relevant part:

A press release we approved announcing the [the integration of the Company's product with Oracle's NetSuite] has been prepared but we have been advised that it is awaiting final review and approval by certain parties, including the Oracle NetSuite CEO, after

which, subject to any changes, will be distributed to the news wires. We have requested that the review and approval process be expedited.

86.    Over the next week, as uncertainty regarding the Oracle Agreement and the nature of the relationship between Oracle and the Company began to ripple throughout the market, the price of the Company's stock declined considerably. At the close of trading on April 30, 2018 the price of the Company's stock had fallen to $1.54 per share, down from $2.45 per share at the close of trading on April 23, 2018, representing a 43% decline.

87.    On April 30, 2018, Defendant Cutaia released a video announcing that Oracle and the Company would issue a joint press release "within days" to give context to the Oracle Agreement and the Company's prior representations. This purported joint press release was never issued.

88.    The price of the Company's stock sunk even lower in the days following Defendant Cutaia's April 30, 2018 announcement, to close at $1.08 per share on May 2, 2018.

## **DAMAGES TO VERB**

89.    As a direct and proximate result of the Individual Defendants' conduct, Verb has lost and will continue to lose and expend many millions of dollars.

90.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company and its CEO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

91.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives.

92.    As a direct and proximate result of the Individual Defendants' conduct, Verb has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

93.     Plaintiff brings this action derivatively and for the benefit of Verb to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Verb, unjust enrichment, and waste of corporate assets, as well as the aiding and abetting thereof.

94.     Verb is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

95.     Plaintiff is, and has been at all relevant times, a shareholder of Verb. Plaintiff will adequately and fairly represent the interests of Verb in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

96.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

97.     A pre-suit demand on the Board of Verb is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Cutaia and Geiskopf (the "Directors-Defendants") and non-parties Philip J. Bond and Kenneth S. Cragun (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to two of the four Directors who are on the Board at the time this action is commenced.

98.     Demand is excused as to all of the Directors-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

99.     In complete abdication of their fiduciary duties, the Directors-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

100.     Additional reasons that demand on Defendant Cutaia is futile follow. Defendant Cutaia has served as the Company's CEO, President, Chairman of the Board, Secretary, and Treasurer since the Company was founded in October 2014, and is thus, as the Company admits, a non-independent director. The Company provides Defendant Cutaia with his principal occupation, and he receives handsome compensation, including $1,622,000 in 2018 for his services. Moreover, Defendant Cutaia is among the largest shareholders of Company stock, owning 3,837,203 shares, or 30.1% of the Company's common stock as of February 1, 2019, and therefore exerts significant control over all actions taken by the Company requiring shareholder approval. As CEO and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Cutaia personally made or signed off on all of the false statements and omissions of material fact that are alleged herein, including those made in the January 8-K, the February 23, 2018 Uptick Newswire interview, the March 1, 2018 video presentation, and the 2017 10-K. Furthermore, Defendant Cutaia is a defendant in the Securities Class Actions. For these reasons, too, Defendant Cutaia breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

101.    Additional reasons that demand on Defendant Geiskopf is futile follow. Defendant Geiskopf has been a Company director since the Company was founded in October 2014, and currently serves as the Chair of the Compensation Committee, and as a member of the Audit Committee and the Governance and Nominating Committee. Additionally, Defendant Geiskopf served as the Chair and sole member of the Audit Committee until September 10, 2018. As a trusted Company director and former Chair of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Pursuant to the Audit Committee Charter, the Audit Committee was responsible for reviewing the integrity of the Company's internal controls and disclosure controls and procedures. As a result of the Audit Committee's failures of management and oversight, Defendant Geiskopf faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

102.    Furthermore, Defendant Geiskopf signed, and thus personally made the false and misleading statements in the 2017 10-K. Thus, for these reasons, Defendant Geiskopf breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

103.    Additional reasons that demand on the Board is futile follow.

104.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, conduct business in an honest and ethical manner,

and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

105.     Verb has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Verb any part of the damages Verb suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

106.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

107.     The acts complained of herein constitute violations of fiduciary duties owed by Verb's officers and directors, and these acts are incapable of ratification.

108.     The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Verb. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Verb, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such

a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

109.    If there is no directors' and officers' liability insurance, then the Directors will not cause Verb to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

110.    Thus, for all of the reasons set forth above, at least two of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against the Individual Defendants for Breach of Fiduciary Duties**

111.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

112.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration Verb's business and affairs.

113.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

114.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Verb.

115.    In further breach of their fiduciary duties owed to Verb, the Individual Defendants made and/or caused the Company to omit that, or make false and/or misleading statements of material fact that failed to disclose, *inter alia*, that: (1) Oracle had not agreed to jointly develop an application to integrate

notifiCRM into NetSuite; (2) Oracle had not agreed to jointly market the Company's software to its customers and the public through, *inter alia*, Oracle's existing network of sales representatives; (3) the Oracle Agreement had thus been overstated; (4) the Oracle Agreement merely provided Verb with access to an application developer toolkit and; (5) Verb had to pay a fee to Oracle in connection with the partnership and access to the toolkit. As a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

116.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

117.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

118.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Verb's stock.

119.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the

fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Verb's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

120.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

121.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Verb has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

122.    Plaintiff on behalf of Verb has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

123.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

124.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Verb.

125.    The Individual Defendants, based on improper conduct, received bonuses, stock options, or similar compensation from Verb that was tied to the performance or artificially inflated valuation of Verb, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

126.    Plaintiff, as a shareholder and a representative of Verb, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation,

including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

127.    Plaintiff on behalf of Verb has no adequate remedy at law.

## **THIRD CLAIM**

### **Derivatively Against Individual Defendants for Waste of Corporate Assets**

128.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

129.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

130.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

131.    Plaintiffs on behalf of Verb have no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Verb, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Verb;

(c)    Determining and awarding to Verb the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)　　Directing Verb and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Verb and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Verb to nominate at least two candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)　　Awarding Verb restitution from Individual Defendants, and each of them;

(f)　　Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)　　Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 26, 2018　　　　　Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

　　　　s/ Robert C. Moest　　　　　　　.
*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Richard Moore am a plaintiff in the within action.   I have reviewed the allegations made in this consolidated shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th day of _____, 2019.

9/25/2019

DocuSigned by:

*RICHARD MOORE*

F2D7A67EA99645A...

Richard Moore